THE THELMA.

(District Court, E. D. Pennsylvania. January 24, 1912.)

No. 57 of 1910.

SHIPPING (§ 84*)—LIABILITY OF VESSEL—INJURY TO STEVEDORE.

A ship, which under the provisions of a charter furnished the winches and power and men to operate the same in the loading of cargo by the charterer, is liable for an injury to a stevedore through the negligence of a winchman, who was one of the crew, although he operated his winch under orders of a hatch tender furnished by the contracting stevedores.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 84.*]

In Admiralty. Suit by John Coleman against the steamship Thelma to recover for personal injuries. Decree for complainant.

Howard M. Long, for libelant.

Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. On December 27, 1910, the Norwegian steamship Thelma was taking on cargo in the port of Philadelphia. When the injury complained of was done, she was receiving heavy sheets or slabs of steel piling varying in length from say 30 to 50 feet, or even more. These slabs were intended for use in the cofferdam around the wreck of the Maine in the harbor of Havana. The ship was under a time charter that required the charterers to pay the cost of loading and discharging, but the ship was to furnish "ropes, falls, slings, and blocks necessary to handle ordinary cargo," etc.; and it was further provided that—

"all steam winches [were to be] at charterer's disposal during the loading and discharging, and steamer to provide men to work same both day and night as required, charterers agreeing to pay extra expense, if any, incurred by reason of night work, at the current local rate."

The loading was being done by a master stevedore under contract with the charterers. The ship lay, bow in, with the pier close to starboard, and the piling was on railroad cars alongside. The particular work in question was going on at No. 3 hatch, and the method was this: Two winches were in use, No. 3 and No. 4. Two booms, A and B, extended from the mainmast, approximately at right angles to each other, and were firmly fixed in place by guys; A extending over the hatch, and B over the car. A wire rope ran from No. 4 winch through two blocks to the end of boom B, where it hung over the car, ending in a short chain and a hook. Another wire rope ran from No. 3 winch through two blocks to the end of boom A, and thence across the ship's deck to starboard, until it reached the wire rope hanging from boom B. These two ropes were then shackled together,

probably near the top of the short chain. The slab was moved in the following manner: A loose chain was first made fast around the slab nearer one of its ends than the other. The hook was then inserted between the slab and the chain. No. 4 winch lifted the slab until it was clear of the car, whereupon No. 3 applied its power, drew the slab hanging at an acute angle across the deck to the mouth of the hatch, and then lowered it slowly into the hold. There the laborers laid hands upon it as it came down and guided it to a momentary resting place upon rollers, afterwards stowing it wherever it was to go. They were, of course, obliged to take off the loose chain that encircled the slab, and if the rollers supported the slab at the right place this could easily be done. Sometimes, however, the sagging of the slab pressed down the chain upon the slabs already stowed, and when this happened the chain was held fast. The weight of the slab was too great for the strength of the laborers, and it then became necessary to apply the power of No. 3 winch, and raise the slab slightly, so that the chain might be taken off. In every instance—whether or not there had been previous trouble with the loose chain—after it was taken off, No. 3 winch raised both chains (the loose chain and the short chain with the hook) above the hatch combings, and they were then drawn back by No. 4 across the ship to starboard, and again lowered to the car for another draft. While a slab was being moved from the car to the hold, both ropes were taut; but, after the slab had been detached and No. 3 winch began to lift the chains out of the hold, there would be some slack in the rope running from No. 4, and, in order to take this up, No. 4 winch was started very soon after No. 3 began to raise the chains. It is evident that No. 4 could not lift or lower the slab after it reached the hatch. If this winch should apply its power while the slab was being lowered or stowed, it could only drag the slab from port to starboard; but it was not a proper part of the operation thus to drag the slab at any time. Nevertheless, it was just this that happened, and caused the injury. The slabs were being stowed on the port side of the hold. One of them (the last for the day, as it happened) had been lowered, and had sagged down so as to hold the loose chain fast. It became necessary that No. 3 winch would raise the slab slightly, so that the chain might be freed and taken off. The proper order for this purpose had been given; but the winchman at No. 4 mistook the instruction, supposed that the chains were to be hoisted, put on his own power in order to take up the slack of his rope, and thereby dragged the heavy slab from port towards starboard, caught the libelant between the slab and the shaft alley, and thus did the injury complained of. It is much disputed whether the injury was done by No. 4 winch, or by the too rapid movement of No. 3. Without discussing the voluminous testimony upon this point, but after reading and considering all of it, I find as a fact that the offending winch was No. 4, and that the injury was done in the manner I have described. Both winches were operated by the orders of the hatch tender, who stood within a few feet of both, and was attending to his duties. He had given a proper order to No. 3 to go ahead a half turn, so as to raise the slab far enough

194 F.—15

to allow the loose chain to be released; but the winchman at No. 4 mistook the order and started his own winch prematurely.

Is the ship liable for his negligence? The hatch tender, the winchman at No. 3, and all the men in the hold were employed by the master stevedore; but the winchman at No. 4 was a seaman, hired, maintained, paid, and furnished by the ship under the charter. He was experienced and competent, and his mistake was not due to lack of skill. He had been assigned to this work by the ship, and could not be removed by the master stevedore. He could only be discharged, or assigned elsewhere, or removed, by the ship. If for any reason, his conduct at the winch had been objectionable, the stevedore could have stopped work, or complained to the mate. Probably another man would then have been substituted; but as long as the seaman was at the winch he was the ship's man, and was doing the work the ship had agreed to do. Nevertheless, whether he had become a fellow servant of the injured man is a question upon which the decided cases differ. If I were at liberty to follow The Elton, 142 Fed. 367, 73 C. C. A. 467, a case in the Court of Appeals of this circuit, I should hold that he was a fellow servant, and that the libelant could not recover against the ship. But I am under a superior obligation to the Supreme Court, and in my opinion the more recent decision in Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480, requires me to hold that he was not a fellow servant, and that the ship is liable for his negligence.

The situation in The Elton did not differ materially from the situation here, as will appear by the following quotation from the syllabus:

"The consignee of a cargo exercised its option to discharge the cargo, being allowed a deduction from the freight therefor, and the vessel being required to furnish steam winches and men to operate the same. The winchman so furnished acted under the immediate orders of the master stevedore employed by the consignee. Held that, if ordinary care was exercised by the master of the vessel to furnish competent winchmen, the vessel was not liable for an injury to the stevedore resulting from a negligent act of one of the winchmen."

The test applied by the court was this:

"In a case like the present, we think the true test of fellow servant is whether both are, at the precise time of the accident, working in a common employment under the same general control and direction."

In Standard Oil Co. v. Anderson the syllabus states the court's conclusion as follows:

"A winchman employed by the person furnishing the hoisting power to a master stevedore for loading a vessel held to remain that person's servant, notwithstanding the hoisting signals were given by the stevedore's foreman, and not to be a fellow servant of an employé of the stevedore who was injured by his negligence."

The Supreme Court concedes that a servant in the general service of another may be so transferred to the service of a third person as to become the latter's servant pro hac vice, with all the legal consequences of the new relation, but adds that to change the original re-

lation, so as to relieve the master, more is required than the mere fact that the servant is sent to do work pointed out by such third person, who has made a bargain with the master for his services. The following paragraph contains part of the court's reasoning:

"It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that the other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work. To determine whether a given case falls within the one class or the other, we must inquire whose is the work thus performed, a question .which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."

In applying this test of authoritative direction and control to the facts of that case—which I think are not essentially different from the facts now under consideration—the court said (212 U. S. 225, 29 Sup. Ct. 255, 53 L. Ed. 480):

"Was the winchman, at the time he negligently failed to observe the signals, engaged in the work of the master stevedore, under his rightful control; or was he rather engaged in the work of the defendant, under its rightful control? We think that the latter was the true situation. The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct, or any other reason. In order to relieve the defendant from the results of the legal relation of master and servant, it must appear that that relation, for the time, had been suspended, and a new like relation between the winchman and the stevedore had been created. The evidence in this case does not warrant the conclusion that this changed relation had come into existence. For reasons satisfactory to it, the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum, and the winchman were its own. It did not furnish them, but furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control.

"Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. But, when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and co-ordination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information, and the obedience to those signals showed co-operation, rather than subordination, and is not enough to show that there has been a change of masters."

Following this decision, I am obliged to hold that the ship is liable for the negligence at No. 4 winch. There was no contributory neg-

ligence on the part of the libelant, and the remaining question, therefore, is the question of damages. The injury was a Potts' fracture of the lower right leg, and there is little serious dispute about the consequences, except about the length of time some of them may continue. Upon this point there is, a difference among the medical witnesses; but as a practical matter I think the libelant's recovery is so nearly complete that he cannot be said to have suffered a serious impairment of earning power. From the professional standpoint, it may perhaps be said with accuracy that there will always be some inconvenience, and (it may be) some diminution of the ability to work; but I feel little hesitation in coming to the conclusion that, while such impairment may be perceptible to a trained sense, it is not marked, and is almost certain to grow better, rather than worse. Taking everything into consideration, his confinement in the hospital, his pain and suffering, the medical attention he has had and may still need, his loss of wages, and some diminution in his ability to work, I think the libelant would be properly compensated by an allowance of $1,800.

A decree for this amount, with costs, may be entered.